IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2019

FILED

08/29/2019

Clerk of the
Appellate Courts

## JAMES WALTER GROOMS, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hawkins County**
No. CC16CR60      Thomas J. Wright, Judge

_____

### No. E2018-01777-CCA-R3-PC

_____

The petitioner, James Walter Grooms, Jr., appeals the denial of his post-conviction petition, which petition challenged his conviction for two counts of aggravated assault, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial.  After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan A. Marion, Sneedville, Tennessee, for the appellant, James W Grooms, Jr..

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Ryan Blackwell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On direct appeal, this court summarized the facts surrounding the petitioner's conviction, as follows:

> This appeal stems from an altercation that occurred on April 13, 2011, between the [petitioner], Bobby Wolf, and Tessaria Monika Childress.  During the altercation, the [petitioner] hit Childress with the handle of a pistol and shot Wolf in the groin area of his right leg.  The

[petitioner] was subsequently indicted for attempted first degree murder of Bobby Wolf, aggravated assault of Tessaria Childress, and employing a firearm during the attempt to commit a dangerous felony.

At trial, Childress testified that in April 2011, she was in a romantic relationship with Wolf, and the couple was living together at the home of Krista Arnwhine, along with Childress's three children and Arnwhine's two children. Childress had known the [petitioner] for several years at the time of the incident. Childress told Wolf about the [petitioner's] advances, and he was present "a couple of times" when the [petitioner] made inappropriate comments to Childress. Childress rebuffed the [petitioner's] advances, but it "didn't deter him."

On April 13, 2011, Childress was cooking dinner when Arnwhine told her that Wolf was outside arguing with somebody. Childress looked outside and saw the [petitioner] with his dog on a long chain arguing with Wolf. Childress believed that the [petitioner] was intoxicated "by the way he was talking, kind of slurring his words and . . . staggering around." Childress told the [petitioner] to go home and told Wolf to return inside, and as she and Wolf walked back towards the house, the [petitioner] yelled something at her. Because she could not hear him, she stepped towards him and said, "[W]hat did you say?" At that point, the [petitioner] pulled out a gun and hit her with its handle "at least five times [.]" Childress yelled for Wolf to help her and when she turned her head, she felt the barrel of the gun pressed against the side of her head. She felt "[s]cared to death" and thought the [petitioner] was going to "blow [her] brains out[.]" The [petitioner] briefly lowered the gun when Wolf approached but raised it "halfway up" and pointed it at Wolf, who stepped back, put his hands up, and said, "[W]hoa[.]" The [petitioner] shouted, "[N]ow, mother-f*****," and shot Wolf. Wolf fell to the ground and yelled, "[H]e shot me in the [testicle], call 911." Childress told Arnwhine to call 911 while she drove Wolf to the hospital.

Childress testified that neither she nor Wolf had been drinking that evening, and Wolf was not armed with any weapons during the altercation with the [petitioner]. She stated that she was in fear for her life and suffered bruising on her neck, arms, and face from the attack by the [petitioner]. On cross-examination, she agreed that she did not seek medical treatment for her injuries, although a doctor did examine her at the hospital on the night of the incident. She also agreed that Wolf is known for being "somewhat" violent.

- 2 -

Wolf testified that on the night of the incident, he walked outside to take out the trash and saw the [petitioner] walking his dog. Wolf had known the [petitioner] for several years and waved at the [petitioner] as he walked by. In response to this gesture, the [petitioner] stated, "I don't associate with snitches and bitches." Wolf did not know what the [petitioner] meant by this comment but responded, "[Y]ou don't know who you are talking to," and an argument ensued between the two men. Wolf thought the [petitioner] was intoxicated because he had "slurred speech and stagger[ed] like he was drunk," so Wolf told him to go home. At that point, the [petitioner] pulled out a black pistol and told Wolf, "I'll shoot you here on the spot." Wolf responded, "[I]f you are going to point it at me, you had better use it." Wolf testified that he did not have any weapons on him and never stepped in the road towards the [petitioner].

During the argument, Childress came outside and encouraged Wolf to go back inside the house. Wolf walked inside to get his cigarettes, and when he returned outside, he saw the [petitioner] strike Childress with the handle of his pistol. Wolf stated that he was in fear for Childress and ran towards her to "jerk her away" from the [petitioner], at which point the [petitioner] shot Wolf. Wolf testified that he did not threaten the [petitioner] with any weapon and was not holding anything that the [petitioner] might have mistook for a weapon. He also stated that Childress did not do anything to the [petitioner] other than "[t]rying to get him to go home" before he began hitting her with the pistol. As a result of the shooting, Wolf had to undergo surgery and had his right testicle removed.

Dr. Daniel Anderson, a surgeon at Holston Valley Medical Center, treated Wolf on the night of the incident and testified as an expert in medical treatment. He testified that a gunshot wound to the groin area can "absolutely" create a substantial risk of death because the femoral artery and femoral vein run through the groin and, if damaged, can result in death or loss of limb. Wolf had a wound "through and through" the soft tissue in the right groin and a wound to his right scrotum, which required removal of Wolf's right testicle. Wolf's wounds were not life-threatening, but Dr. Anderson testified that he would expect Wolf "to have quite a bit of acute pain" during the episode and as he recovered.

Corporal Chad Britton and Detective Chad Evans of the Hawkins County Sheriff's Office responded to the scene that evening. Corporal Britton located the [petitioner] standing outside his parents' house and

- 3 -

searched him for weapons. He found a loaded 9 millimeter handgun in the [petitioner's] back pocket and recalled that although the [petitioner] complied with his commands, he appeared intoxicated. Detective Evans likewise testified that the [petitioner] appeared "very much" intoxicated, and as a result, Detective Evans did not question the [petitioner] about the incident that evening. He and Corporal Britton searched the scene that night for weapons and other evidence but did not find anything. They returned to the scene the following morning and found a shell casing in the road near Arnwhine's home. Later that morning, Detective Evans read the [petitioner] his *Miranda* rights, and the [petitioner] signed a waiver of rights form. He then provided the following statement, which was introduced into evidence and read to the jury:

> Last night at about dusk[,] my dog got off his chain. I went walking and found him. I started back to the house. As I was coming back . . . , I was going by a trailer and Bobby Wolf was in the yard, [and] we got into an argument. He jumped off his porch and came to the road and started arguing. Monika [Childress] got in between us and broke us up. She made [Wolf] go in the house and started escorting me down the road. As [Wolf] was going in the house, he said ["]I've got something for you, mother f'er.["] [Childress] continued walking me down the road. We got about fifty feet and [Wolf] jumped off the porch and started running toward me, he was saying he was going to shoot me. [Childress] r[an] toward [Wolf] trying to stop him when he knocked her down and continued on toward me. I pulled up my pistol and told him to stop, he kept coming, [and] I shot him. I was just trying to hit him in the kneecap, I just wanted to wing him. He fell. I went to my mother's house and told her to call 911. I sat down and waited for the law . . . . When the shooting happened, I was sober. When I got to my parents' house, I got real nervous and knew I was going to jail. I got a bottle of Vodka and drank it like water, my nerves were shot.

Krista Arnwhine testified that she knew Wolf through his relationship with Childress and did not know the [petitioner]. On the night of the incident, she recalled that Wolf went outside when he heard a dog barking. She looked outside and saw Wolf talking with the [petitioner]. Wolf returned inside, and Childress went outside to tell the [petitioner] to go home. Arnwhine testified that the [petitioner] and Childress were

"going back and forth" arguing, and then the [petitioner] "pulled the gun out and starting hitting [Childress]." She described these blows as "pretty forceful" and estimated that he hit her "at least ten" times. Arnwhine stated that when Wolf ran towards the [petitioner] to help Childress, the [petitioner] turned towards him and shot him. Arnwhine testified that the altercation took place at the edge of her yard and the road, and after the shooting, the [petitioner] walked home. On cross-examination, Arnwhine testified that the [petitioner] first pointed the gun at Childress, which prompted Wolf to run towards them in an attempt to help Childress. She agreed that the [petitioner] fired only one shot.

Helen Grooms, the [petitioner's] mother, testified on behalf [of] the defense. At the time of the incident, the [petitioner] lived with his wife and children near her home. She recalled that on April 13, 2011, the [petitioner] cooked dinner at her house and left around 7 p.m. to feed his dogs. He returned to her house "close to dark" and told her, "[C]all 911, I just had to shoot Bobby Wolf." After she called 911, the [petitioner] sat on her front porch to wait for the police. She denied that he drank any alcohol earlier in the evening but testified that he drank "quite a bit" while waiting for the officers to arrive because his "nerves w[ere] tore up." She stated that the morning after the shooting, she and her husband found a knife at the scene of the incident. Her husband put it in a lock box at their house, and she removed it after his death and gave it to defense counsel the week of trial. She testified that she did not give the knife to police after finding it because she "thought they had done their investigation when [her husband] found it." On cross-examination, she agreed that she gave a statement to police after finding the knife but did not mention the knife. She explained that she "forgot about it to be honest."

The [petitioner] testified that on the night of the incident, he was walking home with his dog when he heard someone shout, "[H]ey, MF." He turned around and Wolf, who was standing at the edge of Arnwhine's property, said, "I heard you been telling people I'm a thief." The [petitioner] testified that he continued to walk home, but Wolf followed him, "raising all kinds of threats" and "screaming and hollering" at him. When Wolf ran towards the [petitioner], the [petitioner] pulled out a pistol and said, "[Wolf], stay away from me . . . I am just trying to get home, just stay away from me." The [petitioner] testified that Wolf told him that "if he pulled that pistol on [him], [he] better be ready to use it" and continued to follow him. Wolf then ran into the road, and a fistfight ensued between the two men. Childress broke up the fight and pushed Wolf back towards

- 5 -

the house, but as he was walking away, Wolf told the [petitioner], "I've got something for you MF," and ran inside of the house. The [petitioner] continued walking home but heard a loud "bang" and saw Wolf jump off the front porch and run towards him yelling that he was going to kill him. Childress attempted to stop Wolf, but Wolf threw her to the ground and kept "charging" at the [petitioner]. The [petitioner] raised his pistol and said, "[Wolf], stop." The [petitioner] explained that he planned to shoot Wolf in the kneecap and that he fired only one shot. After shooting Wolf, the [petitioner] walked to his parents' house and asked his mother to call 911 "to get [Wolf] some help down there" because he "didn't want him dying."

The [petitioner] testified that he did not drink any alcohol before the incident but "chugged" a bottle of vodka after the incident while waiting for police to arrive. He denied that he had any type of romantic relationship with Childress or that he sent her any text messages. He also denied that he hit Childress and testified that Wolf threw her down in the road when she tried to stop him. The [petitioner] testified that Wolf had something in his hands as he was running towards him, but he could not tell what it was. He further testified that he did not plan to kill Wolf and stated, "I felt like I had no other choice but to do what I did." On cross-examination, the [petitioner] acknowledged that he did not mention a fistfight between him and Wolf or that Wolf had anything in his hands in his statement to police. He testified that he never intended to kill Wolf and that he shot him in the leg "just trying to stop [him]."

Following deliberations, the jury convicted the [petitioner] of two counts of aggravated assault, one involving each victim. The trial court sentenced the [petitioner] to concurrent sentences of four years and six months' confinement for each conviction for a total effective sentence of four years and six months.

*State v. James W. Grooms, Jr.*, No. E2014-00668-CCA-R3-CD, 2015 WL 4575201, at *1-4 (Tenn. Crim. App. July 30, 2015), *no perm. app. filed*.

After the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief and two amended petitions for post-conviction relief. After the appointment of counsel, the petitioner filed a third amended petition for post-conviction relief, arguing, in part, trial counsel was ineffective for failing to interview potential witnesses, refusing to present a recording of Ms. Childress at trial, and failing to request a continuance after receiving late discovery.

- 6 -

At the post-conviction hearing, the petitioner testified he gave trial counsel the names and contact information for two potential witnesses, Ron Owens and Nathan Wilson. Mr. Owens was interviewed by a local television station shortly after the incident and stated he saw the scene "right after [the shooting] occurred." Additionally, Mr. Wolf's police statement contained the name of another potential witness trial counsel should have interviewed. However, at the hearing, the petitioner could not remember this individual's name. Although the petitioner discussed these witnesses with trial counsel "more than once," the petitioner was unaware if trial counsel ever interviewed or subpoenaed any of the potential witnesses. On cross-examination, the petitioner acknowledged Mr. Owens, Mr. Wilson, and the person named in Mr. Wolf's statement were not present at the post-conviction hearing.

Regarding late discovery, the petitioner testified the State sent additional discovery, including text messages and a CD containing several photographs, the week prior to trial. However, when the petitioner and trial counsel attempted to view the photographs on a laptop, they were not able to be viewed. Consequently, the petitioner testified he first viewed the photographs when they were introduced by the State during the trial. Although the petitioner was "stunned" when the photographs were introduced, he did not request a continuance because he believed trial counsel would know how to handle the situation. However, the petitioner believed additional time to review the photographs may have allowed them to find "something" that supported his claim of self-defense. In addition to the photographs, the petitioner was also concerned about text messages that Ms. Childress referenced during her testimony which suggested the petitioner had romantic feelings for her. The petitioner was not able to review the alleged text messages and wanted to subpoena "the text message record" to show they never existed. On cross-examination, the petitioner agreed trial counsel provided a copy of all discovery as it was received from the State. He also acknowledged he did not bring any of the pictures with him to show the court how he was prejudiced by trial counsel's failure to request a continuance.

The petitioner also testified he was concerned about trial counsel's lack of trial preparation. Trial counsel met with the petitioner's mother on the Saturday before trial and planned to meet with the petitioner on Sunday. However, because trial counsel was unable to meet on Sunday, they were not able to "discuss how [they] were going to proceed."

Finally, the petitioner testified his mother, who passed away prior to the post-conviction hearing, recorded a conversation between herself and Ms. Childress approximately one month after the incident and later gave a copy of the recording to trial counsel. According to the petitioner, Ms. Childress made several statements on the

recording that "are in [his] favor" and "would prove [his] self-defense claim." Although some of the recording was hard to understand, the petitioner testified he could understand "ninety-nine percent of it." Trial counsel, however, told the petitioner that the recording was inaudible and received a continuance to have the recording enhanced. During the trial, the petitioner told trial counsel to introduce the recording during Ms. Childress's testimony, but trial counsel "kept putting it off and off till the trial was over." The recording was played for the post-conviction court, and the petitioner highlighted several statements by Ms. Childress that the petitioner believed were inconsistent with her trial testimony. On the recording, the petitioner believed Ms. Childress described the location of the incident differently, and she also stated she had trouble remembering what happened. On cross-examination, when asked to describe specific statements from the recording that he perceived were inconsistent with Ms. Childress's trial testimony, the petitioner referred to Ms. Childress's statements claiming "she got in between [the petitioner and Mr. Wolf] twice" and "was right on [Mr. Wolf's] heels." However, the petitioner acknowledged Ms. Childress did not waver from her assertion that the petitioner shot Mr. Wolf and hit her in the head with the handle of the gun. The petitioner also acknowledged that he could not be 100 percent sure Ms. Childress was the voice on the recording because he was not present when the recording was made.

Trial counsel then testified, stating he was retained to represent the petitioner at trial after the petitioner's mother approached him in court. In their initial meetings, trial counsel and the petitioner discussed potential witnesses, and, because this "wasn't [the petitioner's] first rodeo," he was aware of his right to subpoena witnesses to trial. Although trial counsel believed he investigated all potential witnesses, he did not recall the witnesses listed in the post-conviction petition, and the petitioner "never provided [an] address or a phone [number] to reach out" to them. Additionally, trial counsel did not recall seeing Mr. Owens on television after the incident. On cross-examination, trial counsel agreed the location of the parties during the incident was "an important issue."

During trial preparation, trial counsel received discovery from the State "a little bit piecemeal." However, trial counsel would share all discovery with the petitioner "as quickly as possible." The week before the trial, the State gave trial counsel a CD containing several photographs. Trial counsel described the photographs as "mostly a panoramic view of the scene [from] various different angles." On the Saturday before trial, the petitioner and his mother met trial counsel at his office to prepare their testimony. At that time, trial counsel reviewed the pictures with the petitioner and gave the petitioner the original CD after making a copy. However, when the petitioner attempted to view the photographs on his personal laptop, he "hit the wrong button" and was unable to view them. Because he met with the petitioner on Saturday, trial counsel did not intend to meet with the petitioner on the Sunday before trial. However, trial

counsel gave the petitioner his cell phone number in case "something developed" that the petitioner needed to discuss.

On cross-examination, trial counsel testified he had adequate time to review the photographs, and the petitioner never asked him to continue the case due to the recently received discovery. Trial counsel also testified he did not receive any text messages during discovery and did not recall the State introducing any text messages during the trial.

Prior to the petitioner's trial, the petitioner's mother gave trial counsel a copy of a recording she had made. However, the recording he received was "inaudible" and "the white noise in it was so bad it made your head hurt to listen to it." Trial counsel asked for a continuance and hired, at his own expense, CSI Tennessee to enhance the recording. Although the enhanced recording was better, trial counsel was not "comfortable" playing it at trial. Because the parts that trial counsel could understand "added little to no value" to the petitioner's case, trial counsel would not promise to introduce it during the trial. At trial, the petitioner asked trial counsel to play the recording, but trial counsel refused because it was hard to understand and would "muddy the waters." Additionally, the trial continued until almost 11 p.m., and trial counsel did not want to introduce something "that [the jury] had to strain to pay attention to." After listening to the recording during the post-conviction hearing, trial counsel agreed he would make the same decision and refrain from playing the recording for a jury. On cross-examination, trial counsel agreed the quality of the recording played at the hearing was better than the copy he received from the petitioner's mother. Although trial counsel agreed inconsistencies with Ms. Childress's trial testimony and the recording could have "potentially" been used to impeach her, he did not believe the recording would have helped the petitioner's case.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.[1]

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to interview potential witnesses, failing to request a continuance after receiving late discovery, and failing to introduce a recording of Ms. Childress at trial. The State contends the post-conviction court correctly denied the petition as the petitioner failed to

---

[1] Although the State questions whether the present appeal is untimely, we have determined the Notice of Appeal was timely filed because it was "placed with a commercial delivery service [UPS], having computer tracking capacity, within the time for filing." *See* Tenn. R. App. P. 20(a).

meet his burden. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688;

*Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.      Failure to Interview Witnesses

The petitioner argues trial counsel was ineffective for failing to interview potential witnesses, specifically Ron Owens, Nathan Wilson, and an individual named in Mr. Wolf's police statement. The State contends the petitioner did not provide any evidence to support his claim. As to this issue, the post-conviction court made the following findings:

> [I]t's alleged that trial [c]ounsel failed to interview or subpoena potential witnesses at trial, including Ron Owens and Nathan Wilson. [The petitioner] also mentioned an individual that he says was identified in the statement of the shooting victim, but couldn't recall his name. With regard to this allegation, there is also a factual dispute with regard to whether or not [the petitioner] provided these or identified these potential witnesses to [trial counsel]. I don't find that there's any critical nature of making a determination whether or not the names were provided to [trial counsel] because there's no evidence in the record as to what, if any, exculpatory testimony Mr. Owens, Mr. Wilson, or an unidentified individual could have provided that would have made a difference in the trial. In fact, I don't think there's any evidence before the [c]ourt that these individuals could even provide and (sic) competent to testify. I don't know what they could say or couldn't say.
>
> . . . .
>
> So because there's no record of any exculpatory testimony that these individuals could provide, there certainly is no clear and convincing evidence that had -- even assuming these names were provided to [trial counsel] -- that had [trial counsel] interviewed and subpoenaed these persons that they would [] have made any difference at the trial of this case.

- 11 -

The record does not preponderate against the findings of the post-conviction court. While the petitioner testified his defense would have benefitted from the testimony of Mr. Owens, Mr. Wilson, and the individual listed in Mr. Wolf's statement, he failed to present any of the individuals as witnesses during the post-conviction hearing. There was also no evidence presented at the post-conviction hearing explaining what the potential witnesses' testimony would have been or how it would have assisted the petitioner's claim of self-defense. Because the potential witnesses were not present at the post-conviction hearing and because no evidence was presented regarding their testimony, the petitioner cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). The petitioner is not entitled to relief on this issue.

## II.     Failure to Request Continuance

The petitioner also argues trial counsel was ineffective for failing to request a continuance after receiving additional discovery the week before trial. The petitioner contends trial counsel did not have adequate time to review the evidence prior to trial. The State contends the petitioner has failed to prove trial counsel was deficient.

At the evidentiary hearing, trial counsel testified he received a CD containing several photographs from the State the week prior to trial. The photographs consisted "mostly [of] a panoramic view of the scene." Trial counsel reviewed the photographs with the petitioner, but, when the petitioner attempted to view the CD on his laptop, the photographs "did not show up." Because he had adequate time to review the photographs, trial counsel did not believe he needed to request a continuance. The post-conviction court made the following findings:

> There certainly were photographs that were provided of the alleged scene as well as of the injuries being the bruises sustained by the female victim. And with regard to those items, the [c]ourt credits the testimony of [trial counsel] that he was able to view those on the CD on his computer and provided a copy which is undisputed that he provided you a copy of the CD. You say you can't, couldn't open it. But regardless whether you could open the CD or not, whether [trial counsel] went over those photographs with you as he said or not, you haven't come in today and said "Here's the pictures, here's what we could have shown if I had had them early enough ahead of time," and "here's why [trial counsel] should have asked for a continuance or objected to these pictures." The [c]ourt can't

- 12 -

make a finding that you were prejudiced by those without you introducing the evidence to show, explain how they prejudiced you and would have resulted in a different result[.]

Although the petitioner argues trial counsel had inadequate time to review the photographs, trial counsel testified he was able to view all of the photographs on his laptop, and the petitioner also viewed them while in trial counsel's office prior to trial. Because many of the photographs were simply different angles of the crime scene, trial counsel did not believe additional time was needed to review them. The post-conviction court accredited trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Furthermore, the petitioner failed to present the photographs during the post-conviction hearing and, therefore, cannot establish prejudice. *See Black*, 794 S.W.2d at 757. Accordingly, the petitioner is not entitled to relief on this issue.

### III.    Failure to Introduce Recording

The petitioner argues trial counsel was ineffective for failing to introduce during trial the recording of a conversation between Ms. Childress and the petitioner's mother. The petitioner contends the recording contradicted Ms. Childress's trial testimony and could have had a drastic impact on the jury. The State contends the petitioner has failed to prove trial counsel was deficient.

Trial counsel testified the petitioner's mother gave him a copy of a conversation she recorded between herself and Ms. Childress approximately one month after the incident. When trial counsel attempted to listen to the recording he was unable to do so because it was inaudible and hurt his head. At his own expense, trial counsel sent the recording to CSI Tennessee for enhancement, but, after receiving the enhanced version, trial counsel decided against introducing the recording at trial. Although the quality was better, many parts of the recording were still hard to understand, and trial counsel was worried the trial court would find it inadmissible. Additionally, trial counsel did not think the contents of the recording added any value to the petitioner's defense. Although the petitioner testified trial counsel promised to introduce the recording, trial counsel disputed this claim. The petitioner also admitted on cross-examination that, because he was not present when the recording was made, he was not 100 percent sure it was Ms. Childress's voice. The post-conviction court made the following findings on this issue:

[I]t's a tough call whether or not any of this recording could be admitted. And the reason it is, is because I can't half understand anything your mama said on it, the recording. And even you or whoever did this typed go-by transcript couldn't either because they just have blanks for a lot of what's

- 13 -

said by [the petitioner's mother]. The problem with that in light of trying to get this admitted is that what one person to a conversation says informs or places into context what the other person says. And so it's difficult to ascribe meaning to one side of a conversation when you cannot accurately understand the other side of that conversation. But even apart from that, apart from assuming that this tape was admissible, I just don't hear discrepancies in there between what was the testimony at trial and what she says on the tape to your mama that would make any difference at all to me as a trier of fact or that I think -- well, not what I think but what I'm finding -- is that nothing that she said in this tape would have made a difference at trial had the tape even been able to be played.

. . . .

There was no discrepancy of significance that I perceived from listening to the discussion, what I could understand of it between the female victim and your mother. And so what I find with regard to that transcript is that Number 1, [trial counsel] made an informed trial decision that it would not be helpful to your case to require the jurors to try to decipher that because the trial was going well and this would, I think maybe he used the words, "muddy the water."

. . . .

So I think the decision made during the trial by [trial counsel], in light of those facts, was appropriate and not to be second-guessed, and didn't result in an adverse outcome.

As noted above, trial counsel's testimony indicates he considered introducing the recording and even requested a continuance to enhance its quality. However, trial counsel ultimately made a strategic and informed decision not to introduce the recording because the quality was poor, many parts of the recording may have been inadmissible, the jury was responding favorably to the petitioner's case, and trial counsel did not believe the contents of the recording added any value. The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. In addition, the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* The petitioner is not entitled to relief on this issue.

- 14 -

## Conclusion

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE